**James A. VANN Jr., Plaintiff,**

v.

**NATIONAL RURAL ELECTRIC COOPERATIVE ASSOC. RETIREMENT AND SECURITY PROGRAM, et al., Defendants.**

**Civil Action No. 96–A–417–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 25, 1997.

for summary judgment.

Robert A. Huffaker, Montgomery, AL; Robert C. Christenson, Atlanta, GA, for plaintiff.

David R. Boyd, Montgomery, AL; John J. Range, Washington, DC, for defendants.

## MEMORANDUM OPINION

ALBRITTON, District Judge.

### I. INTRODUCTION

This cause is before the court on a Motion for Partial Summary Judgment as to Count I and paragraphs 44(a) and 45, filed by the Defendants National Rural Electric Cooperative Association Retirement and Security Program ("NRCEA") and Anthony C. Williams, in his capacity as Plan Administrator ("Williams") (collectively "Defendants") on October 31, 1996; a Motion for Summary Judgment as to Count I of the Complaint filed by the Plaintiff James A. Vann, Jr. ("Vann") on July 3, 1996; and a Motion for Partial Summary Judgment as to Count II of the Complaint filed by the Defendants on July 3, 1997.

Vann filed the Complaint in this case on March 6, 1996, seeking in Count I a declaration and enforcement of his rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA") and under the NRECA Plan, or, in Count II, in the alternative, equitable relief for violation of ERISA fiduciary duties.

The Defendants moved for summary judgment as to Count I and paragraphs 44(a) and 45 of Count II of Vann's Complaint.[1] The Defendants argue that a finding that there are no issues of material fact and that the Defendants are entitled to judgment as a matter of law as to Count I will also dispose of Vann's claims in the designated sections of Count II. The Defendants have also moved for summary judgment as to the remaining portions of Count II. The Plaintiff has opposed the Defendants' Motions and has also argued that he is entitled to judgment as to Count I of the Complaint.

In support of their Motion for Summary Judgment as to Count I and paragraphs 44(a) and 45, the Defendants filed a Memorandum of Law on October 31, 1996. The Plaintiff filed a Memorandum of Law in Op-

position to the Defendants' Motion on January 7, 1997. On January 14, 1997, this court granted the Plaintiff's unopposed motion requesting leave to file an Amended Memorandum of Law, which was subsequently filed on January 14, 1997 and to which the Defendants replied on January 24, 1997.

On February 13, 1997, the Plaintiff filed a Motion to Strike the Defendants' Reply Brief and Supplemental Evidentiary Submission, alleging that the Defendants had raised new arguments and presented new evidence. On March 31, 1997, this court denied the Plaintiff's Motion to Strike, but gave the Plaintiff until April 9, 1997 to file an additional brief and any supplemental evidence. The Defendants were then given until April 18, 1997 to file a reply. On April 10, 1997, the Plaintiff filed, and this court granted, a Motion to File his brief and supplemental evidentiary submission out of time. The Defendants subsequently filed a surrebuttal memorandum of law on April 18, 1997.

On May 14, 1997, the parties filed a joint motion to set a supplemental dispositive motion deadline. On June 4, 1997, this court granted the motion and extended the deadline for filing supplemental dispositive motions. On July 3, 1997, Vann filed a Motion for Summary Judgment as to Count I of his Complaint. Also on July 3, 1997, the Defendants filed a Second Motion for Partial Summary Judgment, moving for summary judgment as to Count II of the Complaint.

For the reasons discussed, the Defendants' Motion for Summary Judgment as to Count I and paragraphs 44(a) and 45 of the Complaint is due to be GRANTED, the Plaintiff's Motion for Summary Judgment as to Count I is due to be DENIED, and the Defendants' Motion for Summary Judgment as to Count II is due to be GRANTED.

### II. FACTS

Submissions of the parties establish the following facts:[2]

---

1. Paragraph 44(a) alleges that Williams and other Plan representatives breached their fiduciary duties by failing to inform Vann of the five-year repayment limitation in Plan Section 12.03. Paragraph 45 states that Vann was injured by the

breach of duty identified in 44(a) because if he had known of the repayment option, he could have repaid his 1988 distribution.

2. Although both Vann and the Defendants have moved for summary judgment as to Count I,

The NRECA is a not-for-profit corporation that is the national trade association for more than one thousand rural electric cooperatives in the United States. The NRECA sponsors benefit plans which provide employees of member cooperatives with pension and other employment benefits, including the Retirement and Security Program for Employees of National Rural Electric Cooperative Association and its Member Systems ("R & S Program"). The terms of the R & S Program are contained in two documents: the "Specifications of the R & S Program," which contains the uniform terms applicable to all participants, and an "Adoption Agreement," which contains terms that vary from participant to participant. The R & S Program provides for retirement benefits.

Vann first became a participant in the R & S Program while employed at Dixie Electric Cooperative, located in Union Springs, Alabama. Under the terms of its Adoption Agreement, Dixie Electric Cooperative elected the earlier of 30 years of service or age 62 as the retirement age for its employees. Vann had accumulated at least 30 years of service at the Dixie Electric Cooperative by 1987.

In 1987, Vann was offered a General Manager position at Alabama Electric Cooperative in Andalusia, Alabama. In deciding whether to take this position, Vann contacted R & S Program staff and requested information on his benefit options and on which options would be most favorable if he were to change employment. Although Vann was 56 years old in 1987, his more than 30 years of service at Dixie Electric Cooperative qualified him for normal retirement benefits. Therefore, Vann was purportedly informed that he could transfer his pension benefit to Alabama Electric Cooperative or could receive payment of the benefit prior to his transfer and immediately begin to accrue service at Alabama Electric Cooperative. Vann now alleges that the R & S Program officials gave him incomplete benefit information upon which to base his 1988 benefits election. After talking to R & S Program

officials, Vann elected to receive a lump sum payment of his Dixie Electric Cooperative accrued pension benefit in the amount of $427,135.29. Vann's last day of employment at Dixie Electric Cooperative was January 4, 1988.

Vann's first day of employment with Alabama Electric Cooperative was January 5, 1988. Vann turned age 62 while working at Alabama Electric Cooperative. Under the terms of its Adoption Agreement, Alabama Electric Cooperative chose 62 as the retirement age for its employees. Therefore, when Vann turned 62, he was eligible to either retire or quasi-retire. If he elected to quasi-retire, he would continue working, but would be eligible for a distribution from the pension benefit plan based upon his service with the Alabama Electric Cooperative. Vann chose to quasi-retire, rather than retire.

When Vann applied for his quasi-retirement distribution, a letter was written to him by Defendant Williams, Administrator of the R & S Program benefit plan, in which he stated that an error had been made in calculating Vann's 1988 lump sum distribution from Dixie Electric. Williams stated that Vann should not have been credited with an entire year of service at Dixie for 1988, but only should have been credited with one month of service, since Vann had not retired as far as his pension was concerned and had continued to accrue service. The letter written by Williams to Vann was drafted by William McKeithan ("McKeithan"), attorney for the RS & I Department.

While disputing the issue of the credit he was due for service in 1988, Vann learned that there was a repayment of benefit option under § 12.03 of the Plan Specifications of the R & S Program. Vann interpreted this provision to mean that if he could repay the 1988 distribution, his years of service at Dixie Electric Cooperative could be combined with his service years at Alabama Electric Cooperative, and his retirement benefit would then be calculated at the higher rate of salary that Vann was receiving while at

there has been no stipulation of facts filed with the court. Therefore, the court has drawn its statement of primarily historical facts from submissions of the parties. Other facts relevant to resolution of legal issues will be discussed in connection with those specific issues.

Alabama Electric Cooperative. Were Vann allowed to repay his 1988 lump sum distribution, he would have been entitled to an additional amount which Vann represents would, as of July 1, 1997, exceed $900,000. Vann, therefore, requested that Williams allow him to repay his 1988 lump sum distribution.

Williams denied Vann the right to repay his distribution for the reasons that Vann had retired from Dixie in 1988 and because the repayment period of five years had already elapsed. The letter in which Williams denied Vann the right to repay his distribution was drafted by McKeithan.

Vann appealed Williams' denial of his 1988 service credit and Williams' denial of Vann's right to repay the 1988 distribution. Vann's appeal was set for a hearing before the NRECA Retirement, Safety & Insurance Committee ("the Committee"). The Committee is composed of members of the NRECA Board of Directors. The Board of Directors is composed of representatives who are elected from each state and territory.

A hearing was held on Vann's claims during which the Committee was presented with arguments and was provided with materials relevant to the claims. After the hearing, the Committee orally denied Vann's right to repay his 1988 lump sum. The Committee reversed Williams on the issue of the year of service credited to Vann in 1988 and granted Vann a full year of 1988 service with Dixie Electric Cooperative.

The Committee then issued a written decision in Vann's case. The written decision letter was prepared by in-house counsel McKeithan and stated that (1) the repayment option was not available to Vann, but that, (2) even if it were available, Vann could not exercise it because the five year period had elapsed; (3) because the repayment option was not available to Vann, Plan personnel had not misled Vann when they failed to disclose this option or the five year limitation period; (4) the five year limitation period would not be waived because Vann had sufficient knowledge of the Plan to be aware of this provision; (5) Vann had sufficient knowledge of the Plan to make a knowing and informed decision concerning the transfer of his Dixie Electric Cooperative Service.

Vann now challenges the Committee's conclusions that (1) he was not allowed to make a repayment because a normal retirement is not a termination of employment; (2) he was not eligible to make a repayment regardless of the time period; and (3) sufficient information was provided to him regarding his transfer of benefit option. Accordingly, he brings a claim for benefits to which he alleges he was entitled and, alternatively, claims for breach of fiduciary duty.

## III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552–53.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In resolving the present cross–Motions for Summary Judgment the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. *Barnes v. Southwest Forest Industries*, 814 F.2d 607, 609 (11th Cir.1987).

## IV. *DISCUSSION*

### A. Standard for Reviewing the Benefits Decision

■ In order to review the decision denying Vann the right to repay his 1988 lump-sum distribution and the right to receive the resulting benefit under § 12.03 of the Plan, the court must apply the appropriate standard of review required for ERISA cases in which a benefits claim has been denied. The parties have argued extensively over the correct standard to be applied by this court.

Although ERISA does not provide district courts with a standard by which to review benefits decisions by benefit plan administrators, the United States Supreme Court has stated that a denial of benefits is to be "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . ." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). In discussing the standard of review, the Court also noted that a purported conflict of interest must be weighed as a factor in determin-

ing whether there is an abuse of discretion. *Bruch*, 489 U.S. at 115, 109 S.Ct. at 956.

In applying *Bruch*, the Eleventh Circuit has developed three standards of review for plan interpretations: (1) de novo review which applies where the plan administrator is not afforded discretion; (2) arbitrary and capricious review where the plan administrator possesses discretion; and (3) heightened arbitrary and capricious review where the administrator has discretion, but there is also a substantial conflict of interest. *See Marecek v. BellSouth Telecommunications,* 49 F.3d 702, 704 (11th Cir.1995). The Eleventh Circuit has further interpreted *Bruch* to mandate de novo review unless the language of the plan expressly provides the administrator with discretionary authority to make eligibility determinations or to construe the plan's terms. *Moon v. American Home Assurance Co.*, 888 F.2d 86, 88 (11th Cir.1989).

■ The Defendants have argued that the arbitrary and capricious standard of review, rather than the de novo standard, should be applied in the instant case because the R & S plan expressly grants discretion to interpret the plan. In support of their argument, the Defendants point to language in the 1993 and 1984 Plan Specifications.[3] Under the 1984 Plan Specifications, the committee "shall have authority to determine all questions arising in connection with the Program, including its interpretation" and "[t]he decision or action of the Committee in respect of all matters within the scope of its authority shall be conclusive and binding on all persons." Section 17.01 of the 1984 R & S Program Specification.

Vann argues that the grant of authority to interpret plan provisions in § 17.01 is not a grant of discretion. However, "reviewing

---

3. Under the 1993 Plan Specifications, the R & S Committee has the "discretion and final authority to interpret and construe the terms of the Program; to determine coverage and eligibility for benefits under the Program . . ." and "the discretionary authority is final, absolute, conclusive, and exclusive, and binds all parties as long as exercised in good faith." Section 17.04 of the R & S Program Specifications. Vann argues that the 1984 Plan Specifications are applicable for purposes of deciding the standard of review since the 1984 Plan Specifications were relied on in making his benefits determination. Since the

court finds that discretion is granted under either the 1984 or 1993 Plan Specifications, the court need not reach this issue. The court also notes, however, that merely because more explicit language was adopted in the 1993 specifications does not lessen the discretionary authority afforded in the 1984 specifications. "[A]doption of a more specific grant of discretion . . . should not preclude use of the arbitrary and capricious standard in reviewing a decision made under the earlier [provision]." *Jordan v. Retirement Committee*, 46 F.3d 1264, 1269 (2nd Cir.1995).

courts have construed plan documents as precluding de novo review—notwithstanding that the relevant provisions thereof apparently did not vest in the defendant administrators or fiduciaries 'discretionary' authority per se." *de Nobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989). Furthermore, the Eleventh Circuit has held language similar to that in § 17.01 of the Plan Specifications is sufficient to confer discretionary authority on the plan administrator. In *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888 (11th Cir.1997), the court found discretionary authority sufficient to require application of the arbitrary and capricious standard of review where the administrator "enjoys the authority to 'initially determine all questions arising from the administration, interpretation, and application of the Plan pursuant to all applicable law, agreements and contracts, and such determination shall be binding upon all persons, except as otherwise provided by law.'" *Id.* at 912; *See also Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38–39 (11th Cir.1989) ("full and exclusive authority to determine all questions of coverage and eligibility" and "full power to construe the provisions").[4] Although the Eleventh Circuit has applied the de novo standard of review when the plan referred only to "authority;" the court did so because the administrator was given authority only to manage and control the plan and was not given a "grant of authority to construe these terms," and there was no indication that the determination was to be accorded deference. *See Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir.1994). In this case, the Committee was given authority to decide questions regarding interpretation of the plan and the Committee's decisions were to be binding; therefore, *Kirwan* does not support a conclu-

sion that § 17.01 does not adequately confer discretionary authority.

In addition, other federal courts have found it significant where, as here, the administrator is not merely given the authority to make decisions, but is given the authority to make decisions based on interpretations. *See Jordan v. Retirement Committee of Rensselaer Polytechnic Institute*, 46 F.3d 1264, 1270 (2nd Cir.1995). In addition, a federal district court examining the same language relied upon in this case has held that the Plan Specification language is sufficient for application of the *Bruch* arbitrary and capricious standard of review. *See Retirement and Security Program for Employees of National Rural Electric Cooperative Assoc. v. Oglethorpe Power Corp. Retirement Income Plan*, 712 F.Supp. 223, 226 (D.D.C.1989)("Section 17.01 of the R & S Program Specification grants the Committee complete discretion to interpret the terms of the plan ..."). Consequently, the court concludes that this plan language sufficiently confers discretionary authority on the Committee so as to require application of the arbitrary and capricious standard or review.

■ Vann argues that regardless of whether the 1984 Plan Specifications expressly confers discretionary authority, the language in the Summary Plan Description fails to confer discretionary authority and, therefore, that this court should apply the de novo standard. Vann argues that discretion which is conferred only in the plan specifications, but not also in the summary plan description is not controlling. However, the Eleventh Circuit has rejected the argument that the requisite plan language conferring discretionary authority must be found in the summary plan description, rather than other plan documents. *See Cagle v. Bruner*, 112

---

4. The court notes that in *Hunt*, the Eleventh Circuit held that an order enjoining the payment of benefits must be directed to a person or entity other than the plan itself *Hunt*, 119 F.3d at 908. In *Hunt*, the court examined the grant of discretion made by the plan documents, assuming that the party against whom relief was granted was the de facto administrator of the plan. *See Hunt*, 119 F.3d at 912. In this case, the parties appear to agree that the Committee is the administrator for purposes of determining the applicable standard of review and that it is the Committee's

decision which is at issue. In fact, the evidence and the Plan documents indicate that the Committee was the final authority on administration of the plan. In other words, even if Williams is the named Administrator, it appears to be undisputed that the Committee acted as the final administrator of the plan. Therefore, the court has focused on the discretion given to, and the decision made by, the Committee. Given the court's disposition of these motions, the court finds that it need not reach the question of whether the proper party has been named in this suit.

F.3d 1510 (11th Cir.1997). In the Eleventh Circuit, courts "look to all of the plan documents to determine whether the plan affords ... enough discretion to make the arbitrariness standard applicable." *Id.* at 1517.[5] Consequently, the discretionary language found in the Plan Specifications is sufficient to require application of the arbitrary and capricious standard of review, even if not also located in the Summary Plan Description.

## B. Analysis of Vann's Claim

■ A determination that the arbitrary and capricious standard applies does not end the court's inquiry with respect to the appropriate standard of review, however, because the concept of arbitrary and capricious must be "contextually tailored." *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1564 (11th Cir.1990). The Eleventh Circuit has identified a range of deference to be applied to an administrator's decision with a "disinterested, impartial decisionmaker deserv[ing] the greatest deference" and fiduciaries with a serious conflict of interest being given slight, or even no deference, so that "the decision, if wrong may be unreasonable." *Id.*

### 1. Conflict of Interest

The parties have argued extensively over the issue of a substantial conflict of interest on the part of the Committee. Vann has argued for a finding of a conflict of interest on three different grounds.·

■ Vann's first argument is that because member cooperatives stood to gain from the excess reserves which would be distributed upon resolution of the trust, the "potential" for a serious conflict of interest arose. To the extent that Vann is arguing that the very nature of the plan as a trust means that the Committee suffered from an inherent conflict of interest, this argument is unavailing. The *Brown* court explained that "decisions on behalf of a plan in the form of a trust lend themselves less readily to the accusation of conflicting interests." *Brown,* 898 F.2d at 1567. While in the context of non-trust benefit plans, denying questionable claims in order to preserve plan funds may present a conflict of interest, in the context of a trust, adverse benefit determinations "may simply reflect that the trustees, bearing in mind the interests of all participants and beneficiaries, made a considered decision to preserve the corpus of the trust." *Id.* (citation omitted).

■ Vann has, however, attempted to distinguish the trust in the instant case from other trusts by arguing that the Committee in the instant case was not independent, but instead suffered from a conflict of interest because, upon dissolution of the trust, the member cooperatives with whom the Committee members were affiliated would receive a distribution of any remaining trust corpus. 1984 Plan Specifications, § 18. Therefore, Vann· argues, the Committee, composed of affiliates·[6] of the member cooperatives, suffered a conflict of interest between its duty to plan participants and its desire to preserve trust assets so that the member cooperatives would have more funds revert to them upon

---

5. Vann also argues that he is entitled to rely on the Summary Plan Description when its provisions conflict with the Plan Specifications. Under the 1979 Summary Plan Description, "the committee rules on all administrative matters concerning the program. Its decisions are conclusive and binding." The court finds that this language does not conflict with the grant of discretion in the 1984 Plan Specifications. Furthermore, there is no evidence before the court that Vann relied on the Summary Plan Description. The Eleventh Circuit has held that to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must show reliance on the summary. *See, e.g., Collins v. American Cast Iron Pipe Co.,* 105 F.3d 1368, 1370 (11th Cir. 1997); *see also·Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir.1992). The Defendants point to Vann's affidavit in which he stated that

he had the 1979 Summary Plan Description in his possession, but does not state that he relied on this document. Vann's Affidavit at ¶ 4. The ·Defendants also provide a letter written by Vann to McKeithan in which Vann states that he "did not specifically rely on any particular document or documents received from NRECA in electing to take the January 4, 1988 benefit distribution." McKeithan Declaration, Exhibit 7. Therefore, the court finds that Vann is not entitled to rely on the Summary Plan Description.

6. Seven of the eight members of the Committee are affiliated with member cooperatives which participate in the R & S Program. Program Deposition (McKeithan) Exhibit 52 (Tab H). Of those seven, three·are general managers and four are directors of the member cooperatives. *Id.*

dissolution of the trust. According to Vann, this interest in the remaining trust corpus removes the plan in the instant case from the usual presumption that decisions made by plan fiduciaries in order to preserve trust assets do not evidence a conflict of interest. Vann characterizes this trust arrangement as giving rise to the "potential serious conflict of interest." Plaintiff's Amended Memorandum in Opposition to the Defendants' Motion for Summary Judgment, page 37. Apparently, therefore, Vann is arguing that the reversionary nature of the trust was an inherent conflict of interest.

There is support in recent Eleventh Circuit precedent for the idea that a reversionary interest in the corpus of a trust is a relevant consideration in deciding whether there is a conflict of interest. *See Buckley v. Metropolitan Life,* 115 F.3d 936. (11th Cir. 1997). The benefits plan in *Buckley* was funded by employer contributions which were then held by a separate trustee, the employer's board of directors appointed the committee which administered the plan, and the benefits were paid from the assets of the trust. The trust in *Buckley* differed from the trust in this case in that the contributions to the trust were nonreversionary. In finding that there was no conflict of interest, the court stated that "benefits are paid from a trust funded through periodic, nonreversionary contributions." *Id.* at 939. Although the court did not explicitly discuss the significance of the fact that the contributions were nonreversionary, the court quoted from a Third Circuit decision that the employer "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." *Id.* (quoting *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40 (3rd Cir. 1993)). In holding that no conflict existed where trust funds could only be used for the benefit of members of the plan or for expenses of the plan and fund, the *Abnathya* court cited to the Tenth Circuit's reasoning in *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452 (10th Cir.1991). *See Abnathya,* 2 F.3d at 45 n. 5. In *Woolsey,* the Tenth Circuit reasoned that because a plan had a nonreversion clause which stated no part of the trust find would revert to the company for its

benefit, the company incurred no direct expense as a result of favorable benefit payments to beneficiaries nor benefitted from denials of payment. *Id.* at 1459. It is also clear from Eleventh Circuit precedent recognizing the inherent conflict of an insurance company administering a benefits plan or an employer administering a plan from its operating assets, that an inherent conflict of interest is recognized when the administrator incurs a direct, immediate expense from benefits determinations. *See Brown,* 898 F.2d at 1561. In order for this court to conclude that the trust in this case created a conflict of interest, therefore, it appears that payment of funds out of the trust must have caused a direct, immediate expense so as to constitute a conflict of interest on the part of the Committee members.

This case is factually distinct from those cases in which an inherent substantial conflict of interest has been recognized. This case does not involve an insurance company, nor does it involve an employer whose employee is administering benefits from the operating assets of the company. *Compare Brown,* 898 F.2d at 1561; *Stvartak v. Eastman Kodak Co.,* 945 F.Supp. 1532 (M.D.Fla. 1996) (inherent conflict of interest where corporate benefits director reviews claim on unfunded employee welfare benefit plan). Instead, the Committee members in this case are selected from the RS & I Board of Directors. The Board members are elected by the member cooperatives and represent each state and territory. In addition, unlike the inherent conflict of interest cases, the funds which could be paid to the member cooperatives are not paid from their operating expenses. Instead, when and if the benefits trust is terminated, the member cooperatives have a reversionary interest, after all other claims have been paid. In light of the evidence presented, the court concludes that the purported expense incurred by the member cooperatives is not sufficiently direct and immediate to place this case within those cases involving an inherent conflict of interest.

In addition, the Defendants have presented evidence that the Committee did not consider termination of the trust and that even if

it had, the Committee does not have the authority to terminate the trust, only the full NRECA Board of Directors has this authority. The Defendants also present uncontested evidence that such a decision would have to be approved by the Internal Revenue Service and the Pension Benefit Guaranty Corporation and labor unions. The Defendants also state that if the trust were to be dissolved, the benefit to each of the cooperatives in denying Vann's claim would have been too slight to create a conflict of interest. Courts have recognized that the minimal nature of denial of a single benefit makes the existence of an improper motive unlikely. *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1051 (7th Cir.1987). Consequently, in addition to the fact that member cooperatives did not suffer a "direct and immediate" expense, to the extent that they did receive some benefit, the court finds that the relationship between the supposed benefit to the member cooperatives and the Committee members is too attenuated to constitute a "substantial" conflict of interest. *Brown,* 898 F.2d at 1566.

In addition to this alleged inherent conflict of interest, Vann has also argued that the Committee had a conflict of interest based on McKeithan's involvement in the deciding of Vann's appeal. The Defendants argue that the mere participation of in-house counsel in interpretation and administration of a plan does not constitute a conflict of interest. *See e.g. Short v. Central States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 574–75 (8th Cir.1984) (discussing facts under which a Committee's consideration and adoption of letter drafted by counsel setting forth reasons supporting denial of claim was acceptable). Vann apparently concedes that mere involvement of counsel in the resolution of claims is itself not objectionable. Plaintiff's Response to Defendants' Reply, page 14. However, Vann argues that McKeithan's involvement is analogous to a conflict of interest recognized in *Nightingale v. Blue Cross and Blue Shield,* 41 F.3d 1476 (11th Cir.1995).

In *Nightingale,* an employee's claim to benefits was denied, so she brought suit. *Id.* at 1479. Her case was subsequently dismissed in federal district court without prejudice so that the plaintiff could exhaust her administrative remedies. *Id.* The plaintiff's claims were then presented to the chief claims evaluator of Blue Cross. *Id.* The attorney opposing the plaintiff's claim was from Blue Cross' legal department and had been involved in the earlier dismissed case. *Id.* Once the employee's claims were denied by the administrator, she again filed suit. *Id.* The district court found that the chief claims evaluator suffered from a conflict of interest because she was aware that her employer had been opposing the plaintiff's claims in two years of litigation. *Id.* In upholding the district court's finding, the Eleventh Circuit noted that there were procedural irregularities in the processing of the claim in that the task of the claims evaluator was explained to her by an in-house Blue Cross attorney who had been intimately involved in the litigation, that the attorney had ex parte communications with the administrator, and that this attorney assisted the claims evaluator in editing her administrative opinion. *Id.* The court found significant, in discounting the administrator's argument that it was protected against self-interest, the fact that the "supposedly objective claims administrator is taking ex parte advice from the lawyer who is representing Blue Cross in front of her ..." *Id.*

Vann states that, under *Nightingale,* the Committee also suffered from a conflict of interest. It is apparently undisputed that McKeithan drafted the letters which previously denied Vann's requests for benefits, that McKeithan had a brief meeting outside of Vann's presence with two of the committee members before the hearing on Vann's claims, and that McKeithan drafted the letter denying Vann's benefits on behalf of the Committee after the Committee orally denied Vann's claim. Vann interprets *Nightingale* as establishing that these actions on the part of McKeithan, which Vann characterizes as procedural irregularities, are sufficient evidence of a conflict of interest on the part of the Committee.[7]

---

7. Vann also apparently argues that the Committee was influenced by McKeithan's alleged desire

Although Vann attempts to rely on the alleged existence of procedural irregularities as proof of a conflict of interest, this court does not read *Nightingale* as establishing that an attorney's actions are themselves sufficient to require heightened arbitrary and capricious review. In *Nightingale,* the court reasoned that the fact that the claims administrator was fully aware that her employer had been fighting to deny the claim was "evidenced by some procedural irregularities." *Nightingale,* 41 F.3d at 1481. Therefore, this court reads *Nightingale* as stating that procedural irregularities, the attorney's involvement, were the means by which the administrator learned of her employer's position, but that the conflict of interest was between the administrator's duties to the plan participant and her own employer. In other words, to constitute a conflict of interest, there must be an interest competing with the administrator's duties to the plan participant.

Under the apparent rationale of *Nightingale,* therefore, this court must determine if Vann's evidence of alleged procedural irregularities indicates that there was a substantial conflict between the Committee's duties to Vann and a competing interest. It is clear that McKeithan's involvement could not have alerted the Committee members to a position taken by their own employers since the Committee members were apparently employed by member cooperatives and were not employed by the Plan. Vann has argued, however, that McKeithan's involvement indicated to the Committee that McKeithan, the Plan's attorney, had already taken a position against allowing Vann's claim. Apparently, therefore, Vann argues that the Plan had taken a position just as the claims administrator had taken a position in *Nightingale.* However, in *Nightingale,* there was more than just a denial of a claim; the claims administrator had actually opposed the participant's claim in a trial. Furthermore, if the mere fact that a claim had been denied were sufficient to indicate a Plan's opposition to a claim to create a substantial conflict of

interest, this would result in the untenable conclusion that every time the Committee reviewed a claim denial, it operated under a conflict of interest. Therefore, the court finds that the mere fact that the attorney drafted a previous letter denying a claim on behalf of the plan is not evidence that the reviewing Committee was operating under an inherent conflict of interest.

Vann has also presented evidence that during a meeting with two Committee members, McKeithan discussed a "loophole" that could be created by Vann's interpretation of the plan. An argument could be made that, under the *Nightingale* rationale, the Committee members would want to please their own employers by avoiding a "loophole" in the plan. Vann has further argued that McKeithan was attempting to mislead the Committee members by making this statement since any alleged "loophole" was remedied for future claims by amendment of the Plan Specifications. The Defendants have argued, however, that McKeithan could not have mislead the Committee since it was aware of the amendments. Even if the court assumed that McKeithan's statements alerted the Committee to the opportunity to avoid a loophole in the Plan, this motivation could be consistent with their obligation to act with "due regard for the preservation of trust assets." *Brown,* 898 F.2d at 1568. However, as was earlier discussed, Vann has attempted to distinguish the administration of this trust from trusts administered by independent trustees because the trust had a reversionary interest. Therefore, to the extent that McKeithan's statements alerted the Committee members to this information, the information related to the same alleged conflict of interest based upon the future possibility of the member cooperatives receiving funds when the trust was dissolved, which the court has found did not constitute a substantial conflict of interest. Therefore, the court finds that the Plaintiff has failed to establish that a substantial conflict of inter-

to uphold his prior determinations of McKeithan's claims. Whether or not this would constitute a substantial conflict of interest on the part of McKeithan, imputing this alleged conflict is

not supported by the evidence. The undisputed fact is that the Committee reversed one of McKeithan's earlier determinations.

est under the rationale of *Nightingale* is reflected in McKeithan's involvement.

Vann also posits that the Committee suffered from a conflict of interest because it was motivated to retain as many member cooperatives as possible in order to keep down administrative costs. Without deciding whether a motive to keep down administrative costs could constitute a conflict of interest, this court finds that Vann has failed to provide any evidence to support this assertion of a conflict of interest. No evidence has been provided to this court to establish from what source administrative costs of the plan are paid. Furthermore, to the extent that the inference can be drawn that administrative costs are paid out of the trust, the underlying conflict of interest would apparently be in preserving trust assets for the ultimate benefit of the member cooperatives—the same alleged conflict of interest already identified by Vann and previously held by this court not to constitute a substantial conflict of interest. Therefore, in the absence of a showing by Vann that there is evidence to support a finding that the Committee suffered from a substantial conflict of interest, this court will review the Committee's decision under the arbitrary and capricious standard of review.

### 2. Application of Arbitrary and Capricious Standard

"This court may disturb the decision of the . . . Committee only if the plaintiff has established that the decision . . . was arbitrary and capricious." *Griffis v. Delta Family–Care Disability,* 723 F.2d 822, 825 (11th Cir.1984). Under the arbitrary and capricious standard of review, the court is limited to deciding whether the interpretation of the plan was made rationally and in good faith, not if it was correct. *Cagle v. Bruner,* 112 F.3d 1510, 1517 (11th Cir.1997). There are several factors which may be tak-

en into account in applying the arbitrary and capricious standard: (1) the uniformity of the administrator's construction; (2) the reasonableness of its interpretation; (3) possible concerns with the way unexpected costs may affect the future financial health of the plan. *Id.; Blank v. Bethlehem Steel Corp.,* 926 F.2d 1090, 1093 (11th Cir.1991). The court may also look for other evidence of good faith in (1) the internal consistency of the plan under the interpretation given by the administrators; (2) any relevant regulations formulated by the appropriate administrative agencies; (3) the factual background of the determination by a plan administrator and inferences of lack of good faith, if any. *Blank,* 926 F.2d at 1093. Courts addressing the issue of what weight to assign to each of these factors have determined that the factors must be looked to in the aggregate. *McKinnon v. Blue Cross–Blue Shield of Alabama,* 691 F.Supp. 1314 (N.D.Ala.1988), *aff'd,* 874 F.2d 820 (11th Cir.1989).

The arguments of the parties have indicated to the court that there is some discrepancy as to the decisions which are to be reviewed by this court. Therefore, the court will address the factor of reasonableness of interpretation first.

#### a. *Reasonableness of Interpretation* [8]

Section § 12.03 of the Plan Specifications states that "a Participant who receives a single cash payment upon termination of employment or early retirement may repay to the Program the amount of the single sum plus interest. . . . Repayment must be made within five years of the Participant's resumption of employment. . . ."

The Defendants appear to argue that there is only one interpretation which is relevant in this case. However, Vann's arguments to the court have identified two interpretations which were made by the Committee. There-

---

**8.** In recent decisions, the Eleventh Circuit has indicated that courts must evaluate the reasonableness of the participant's plan interpretation even under the arbitrary and capricious standard of review, rather than just the heightened arbitrary and capricious standard of review. *See Buckley v. Metropolitan Life,* 115 F.3d 936 (11th Cir.1997); *Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547 (11th Cir.1994). However,

the Eleventh Circuit does not always employ this analysis in the context of the arbitrary and capricious standard. *See Cagle,* 112 F.3d at 1517. Therefore, although the court has not set out analysis of Vann's interpretation as a separate step, the court has addressed his interpretation within the discussion of the reasonableness of the Committee's interpretation.

fore, the court will address the reasonableness of both interpretations.

### 1. "Termination" as Not Including "Retirement"

■ In essence, the Defendants have argued that the Committee was correct in its conclusion that § 12.03, specifically the word "termination," does not include persons who have engaged in a normal age retirement. According to the Defendants, "termination" from employment means separation from service due to resignation, layoff, or other similar event—but not a normal age retirement. Defendants' Response to Plaintiff's Motion for Partial Summary Judgment, page 7. The Defendants have argued that the Committee's interpretation that "termination" includes a layoff, resignation, or similar event, but not a normal retirement, is the only reasonable interpretation of the word "termination" within the context of § 12.03.

Vann has argued in his Motion for Summary Judgment that the Committee's interpretation is arbitrary and capricious because, under the plain language of § 12.03, he was entitled to repay his lump sum distribution because he was a plan participant who received a single cash payment upon termination of his employment. Vann argues that he was entitled to rely on the plain terms of § 12.03 because plan participants are entitled to rely on the "face of written plan documents." *See Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). Vann argues that the Committee was not faithful to the plain language of the plan because "termination" is clearly a qualifying event and the Defendants have not disputed that Vann's employment was terminated.

As evidence in support of this argument, Vann also points to a "Summary of Major Facts" drafted by McKeithan, the Plan's attorney, in which he stated that Vann's employment was "terminated." Vann also presents deposition testimony of Leota Henry, Assistant Manager of Marketing Operations, and Administrator Williams in which Vann says they admit that Vann's employment was terminated. The Defendants, of course, have disputed Vann's characterization of the testimony, arguing that the witnesses were not characterizing Vann's employment circumstances as a "termination" for purposes of § 12.03. Vann's argument with respect to this evidence does not appear to be an assertion that the Defendants have conceded that Vann's employment ended in a way contemplated by § 12.03, but rather an argument that "the Defendants have not attempted to argue that Vann's employment ... was not terminated .... [r]ather, the RS & I Program has attempted to justify its denial of Mr. Vann's claim by asserting that § 12.03 does not apply to any termination occurring after a participant reaches normal retirement age." Vann's Brief in Support of the Motion for Summary Judgment, page 9. In essence, Vann is arguing that because many of the Defendants' witnesses have referred to his employment situation as a "termination," it was unreasonable for the Committee to depart from this general, purportedly commonsense meaning of "termination," and to exclude Vann from § 12.03 because his termination occurred at retirement age.

Vann has pointed out that the Plan Specifications acknowledge "termination" in a broad sense. Vann argues that the Plan consistently refers to "retirement" as a subset of "termination," so that the Committee's narrow definition of "termination" in § 12.03 is not consistent with the Plan. The court agrees with Vann that in Sections One and Seven of the Plan Specifications, "termination" is a larger category that includes the subset of "retirement. "As Vann points out, the very purpose of the plan, as stated in § 1.01 is to provide benefits upon "retirement or earlier termination." Section 7, the Benefits section, explains that the purpose of the plan is to provide retirement benefits, but that no benefits will be payable "prior to retirement, death, or other termination of employment." Vann and the Defendants, however, view these sections as supporting different propositions. According to Vann, these sections indicate that retirement can be a sub-set of termination, therefore, to read "retirement" out of "termination" in § 12.03 is unreasonable. The Defendants have stated, as did the Committee, that these sections indicate that there is a distinction between "retirement" and "termination."

The court finds the parties' positions are both tenable. That is, while "retirement" is a subset of termination, the plan recognizes that there are forms of "termination" which are not "retirements." The distinction between the two concepts is reflected in § 11.03, in which the Plan refers to payment of a single sum of a benefit to a participant who has "retired or whose employment has been terminated," apparently recognizing that a participant may be entitled to payment of a lump sum benefit under either circumstance. The distinction is also recognized in § 10.01 which refers to persons whose employment has been "terminated," other than by retirement. Therefore, the question is whether it was reasonable for the Committee to interpret the word "termination" as excluding "retirements" for purposes of the lump sum benefit option in § 12.03.

The Defendants have argued that Vann's interpretation that "termination" in § 12.03 is referred to in its broad sense, rather than a more limited sense, is not reasonable because it renders the "early retirement" portion of § 12.03 meaningless. Vann has argued that his interpretation would not render "early retirement" meaningless. Vann states that by arguing that his interpretation renders "early retirement" superfluous, the Defendants have ignored the disjunctive nature of the phrase wherein either being terminated or retiring early entitles one to repayment under § 12.03. However, the court understands the Defendants' argument to be that it is precisely the disjunctive nature of the provision which makes Vann's interpretation problematic. That is, if "termination" is meant in its broad sense so that it includes all instances of severance of employment, then it includes an early retirement, and there would be no need for the Plan Specifications to provide for "early retirement" as an alternate triggering event under § 12.03.

Vann also raises another possibility in his Reply to the Defendants' Response to the Plaintiff's Motion for Summary Judgment.

According to Vann, if "termination" includes "retirement," the phrase "early retirement" still has meaning because it precludes those who have quasi-retired from using the repayment option. As Vann explains it, a person who quasi-retires does not terminate employment and is not early retired, so cannot make use of the repayment option. It appears, therefore, that Vann is arguing that even if "termination" includes "retirement," the phrase "early retirement" is not superfluous because it is needed to exclude those who "quasi-retire." The court does not agree. Section 12.03 is an affirmative statement of those participants who are entitled to make use of the repayment option. Even under Vann's definition of "termination" as a severance of employment, a person who quasi-retired would not have a termination. Therefore, there would be no need to rely on the phrase "early retirement" to indicate that § 12.03 did not include those who had quasi-retired.

■ The court agrees with the Defendants that, on its face, the phrase "termination or early retirement" cannot be read, as Vann has argued, so that "termination" means all severance of employment. If such an interpretation were made, "early retirement" would be rendered a useless phrase, having been included in the phrase "termination." An interpretation that gives meaning to all parts of a contract is preferred to an interpretation that leaves some portions meaningless. *Guaranty Fin. Servs. Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991); *see also Bayles v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97 (5th Cir.1979). Therefore, Vann has not offered a reasonable interpretation of § 12.03 by arguing that "termination" includes "retirement." Instead, the Committee's interpretation that "termination" is intended to have a more limited meaning in § 12.03 is reasonable.[9]

9. The Defendants have also argued that the court should look to the drafting history of § 12.03, which Vann has disputed by arguing that there is insufficient evidence that the Committee considered the drafting history. The court does not reach this issue, however, because the court finds that the Committee's interpretation of "termination" as not including "retirement" is supported by a fair reading of the language of the plan and need not be resolved by reference to drafting history.

### 2. Interpretation of "Retirement"

While the Defendants do not focus on the fact that the Committee made more than one interpretation relevant to § 12.03, implicit in the Committee's affirming the Administrator's denial of Vann's claim under § 12.03 based on the fact that a "retirement" is not a "termination," is an interpretation [10] by the Committee that Vann had "retired" under the terms of the plan. In fact, the decision letter of the Committee indicates that Vann was a "'retired employee,' not a 'terminated employee,' because [he was] eligible for normal retirement benefits under Dixie Electric's 30–year Retirement and Security Program." Decision letter, page 3.

Vann, however, has argued that he was not a retired employee. In other words, Vann appears to argue that even if "termination" in § 12.03 refers to a more limited set of circumstances than all severance of employment, it applied to Vann's circumstance because he did not retire. Vann has pointed out that he indicated on a form that he thought he was "transferring." Vann has also cited to cases in which courts have held that "termination" refers to severing of the employer-employee relationship, whereas "retirement" ordinarily means to withdraw from one's position or occupation, *Meredith v. Allsteel, Inc.*, 11 F.3d 1354, 1358 (7th Cir.1993), *overruled in part on other grounds by Ahng v. Allsteel, Inc.*, 96 F.3d 1033 (7th Cir.1996), and that separation from one employer and immediate employment with another is not a retirement. *Rowe v. Allied Chemical Hourly Employees' Pension Plan*, 915 F.2d 266, 269 (6th Cir.1990). The Defendants have argued that these definitions are not applicable because they were not made within the context of the plan which is at issue in this case. *See Meredith*, 11 F.3d at 1358 ("Under common law rules of contract interpretation, we give the word retire its ordinary meaning in the context of the plan.") The court agrees that any reading of a Plan term must be consistent with the Plan in order to be considered a reasonable interpretation of the Plan.

Vann points to a section relied upon by the Defendants to establish that the Plan recognizes a distinction between "termination" and "retirement." Section 10 contains provisions which allow for persons who leave a member cooperative to transfer pension benefits to a new member cooperative if they are hired within a certain time frame. This is known as the "portability" provision. Vann argues that he was told by the Defendants before he elected to receive a lump sum distribution that he was eligible for the portability provisions of § 10.06. The Defendants do not contest that § 10.06 applied to Vann. However, in § 10.01, the Plan states that § 10 applies to participants "whose employment is terminated (other than by retirement at or after age 55 or death)...." According to Vann, this provision indicates that although his employment was terminated and he was eligible to receive his full retirement benefit, he is not a person who "retired" because, had his employment been terminated by retirement, he would not have been eligible for the portability provision. Therefore, according to Vann, the Committee acted unreasonably in determining that his employment had not concluded as a result of a "termination" rather than a retirement.

The Defendants contend that the Committee's interpretation was reasonable and was the only correct interpretation. The Committee's definition of retirement was that a person who left employment when eligible for full retirement benefits as a result of having reached normal retirement age was a person who retired. Decision Letter, page 3. The court finds that this interpretation is a fair and reasonable reading of the Plan. The stated purpose in the Plan Specifications is to provide benefits upon "retirement or earlier termination." Plan Specifications, § 1.01. An employee may be entitled to benefits as a result of a normal retirement, an early retirement, or a postponed retirement. Plan Specifications, § 7. The benefit to which the

---

**10.** It is possible that the statement by the Committee could properly be characterized as a fact-finding since the Committee determined that Vann had retired. However, the same standard of review would apply since the Eleventh Circuit has indicated that fact questions are to be analyzed under the arbitrary and capricious standard if discretion is afforded by the plan documents. *See Buckley*, 115 F.3d at 940.

person is entitled is dependent upon whether he leaves employment at normal retirement age. *Id.* A person who receives a retirement benefit when he retires on his Normal Retirement date engages in a normal retirement. *Id.* at § 7.02. However, if the benefit is payable prior to Normal Retirement age, then the benefit is actuarially reduced. Plan Specifications, § 21. A lump sum payment must be paid within twelve months "following the date of the Participant's actual retirement." *Id.* §. 9.04. These provisions of the plan indicate that a person receiving full benefits upon reaching retirement age is considered to have engaged in a normal retirement. Vann did not receive an actuarial reduction of his benefit. Therefore, the Committee's interpretation was a fair reading of the Plan.

▮ The Defendants have explained that the Committee could not have adopted the interpretation of § 12.03 based on the interaction of § 10.06 and § 10.01 argued for by Vann. The Defendants first point out that applicability of § 10.06 was not intended to qualify the definition of "retirement," but rather that § 10.01 was not supposed to be an applicability section relevant to § 10.06. The Defendants explain, and provide evidence which indicates, that the inclusion of these two provisions in one section was the result of a drafting error. However, because plan beneficiaries are entitled to rely on the face of plan documents, the court will not consider this evidence with regard to a drafting error.

The Defendants also argue that Vann's interpretation is unreasonable because it would affect other sections of § 10, and render them useless because they would not apply since all persons eligible for a transfer would be considered to be "terminated," rather than "retired" persons. According to the Defendants, such an application would also mean that one portion of § 10 would violate the tax code. Therefore, according to the Defendants, only the Committee made a reasonable interpretation; that is, that Vann's situation constituted a normal age retirement.

The court recognizes that Vann's interpretation is based upon the wording of § 10.01

and upon § 10.06 as interpreted by the Defendants. Therefore, although the court agrees that the Committee made a reasonable interpretation of "retirement," the court hesitates to conclude that Vann's interpretation is unreasonable, insofar as he relied on the language of § 10 because participants are entitled to rely on the plan as written. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).

However, even if Vann has advanced a plausible interpretation, Vann's interpretation does not necessarily mean that the Committee's interpretation is not entitled to deference. According to Vann, his interpretation should be accepted by the court as the correct interpretation. Vann argues that should this court recognize an ambiguity in the plan, presumably based on the existence of two plausible interpretations, the rule of contra proferentum is to be applied. The Defendants have argued that contra proferentum does not apply under arbitrary and capricious review, but only under heightened arbitrary and capricious review.

▮ While the court recognizes that there is broad language in Eleventh Circuit precedent indicating that contra proferentum applies in all ERISA plan interpretation cases, this doctrine is most commonly discussed in connection with the framework of heightened arbitrary and capricious review, in which a claimant's reasonable interpretation is taken as correct, and a fiduciary may only prevail if the fiduciary can prove that the decision was not tainted by a conflict of interest. *See Nightingale,* 41 F.3d at 1481; *Compare Collins v. American Cast Iron Pipe Co.,* 105 F.3d 1368 (11th Cir.1997) (discussing, but not applying contra proferentum in a case without a finding of a conflict of interest). In other words, even under heightened arbitrary and capricious review, contra proferentum is not the last word, but merely establishes that the fiduciary has to dispel the taint of the conflict of interest if the claimant proposes a reasonable interpretation of the plan. Furthermore, prior binding Eleventh Circuit case law applying the arbitrary and capricious standard of review has explicitly held that the court must only determine if the decision was made rationally and

in good faith, not if the decision was right. *Griffis v. Delta Family–Care Disability,* 723 F.2d 822, 825 (11th Cir.1984).

In the context of this case, however, the court need not delineate the extent to which contra proferentum might apply to ERISA cases because the Eleventh Circuit has recently indicated that contra proferentum is not to be applied in a situation where the plan participant and the fiduciary have both articulated plausible interpretations of a plan provision. *See Cagle,* 112 F.3d at 1519. In *Cagle,* the district court found that the competing interpretations were both plausible and so construed all ambiguities against the benefits find and found the find's interpretation to be arbitrary. *Cagle,* 112 F.3d at 1519. The Eleventh Circuit explained that the district court erred because the " 'reasonable interpretation' factor and the arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the Fund." *Id.* The court explained that, when faced with competing plausible interpretations, if the fiduciary's interpretation is reasonable and is consistent with the law, then the reasonableness-of-interpretation factor militates against a conclusion that the fiduciary has acted arbitrarily and capriciously. *Id.*

### b. *Uniformity of Construction*

 Vann has argued that the factor of uniformity of construction points to a conclusion that the Committee acted arbitrarily and capriciously in deciding that he was not entitled to make use of the repayment provision in § 12.03. According to Vann, the Committee departed from its usual practice in Vann's case and, therefore, acted arbitrarily and capriciously.

Vann states that until Vann's appeal, the Defendants had allowed other participants to make use of the repayment provision under § 12.03. Vann has presented evidence that several persons were allowed to pay back lumpsum distributions even though the five-year limitation period in § 12.03 had elapsed. R & S Program Deposition (McKeithan), pages 251–53. Vann asserts that there is no evidence to show that any R & S Program participant who has applied for restoration of credit service has ever been denied the right to do so.

 In the Eleventh Circuit, inconsistent application to similarly situated persons is evidence that a decision is arbitrary and capricious. *See Blank,* 926 F.2d at 1094 (stipulated difference is ample basis for finding that decision was not arbitrary); *Cagle,* 112 F.3d at 1519 (consistent interpretation where uniformly applied in similar circumstances). The Defendants have presented evidence that, although the people pointed to by Vann were allowed to circumvent the five-year limitation, they had all received their distributions before reaching normal retirement age. Declaration of Leota Henry, ¶¶ 22, 23. The court agrees that because the decisions to allow repayment under § 12.03 were relevant to the five-year limitation, and not the status of the participants, these decisions were different from the decision regarding Vann's denial of benefits. If the court's inquiry at this time were whether the Committee acted arbitrarily and capriciously in applying the five-year time limit, then there could be a question of fact as to whether the Committee had consistently applied its rules.[11] However, to establish that the Committee acted arbitrarily and capriciously by inconsistent application of § 12.03 to Vann, Vann would have to present evidence that other persons who received their lump sum distributions by virtue of a normal age retirement were allowed to make use of the repayment provision. Vann has not presented such evidence. To establish that the Committee acted arbitrarily and capriciously by inconsistent application of the interpretation of "retirement," Vann could present some evidence that other persons similarly situated to him had been considered by the Committee not to have been retired employees. Although the parties have apparently engaged in extensive

---

11. The application of the five-year limitation presents a separate question. The Defendants have argued that the five-year time limit was waived because the applicants were not aware of the option in § 12.03, and the Committee found that Vann had sufficient information about § 12.03. However, this issue does not bear on the question of whether § 12.03 was consistently applied to persons who received benefits as a result of reaching normal retirement age.

discovery, Vann has not presented such evidence.

Vann has also argued that the interpretation of "retirement" has not been uniformly applied by the Defendants. Vann has pointed out that when Administrator Williams wrote to Vann regarding his lump sum distribution, he explained that Vann had not retired for purposes of the pension plan. Williams later also wrote that Vann had retired and, therefore, was not entitled to make use of the repayment provision in § 12.03. However, this alleged lack of uniformity cannot be imputed to the Committee. The evidence indicates that the Committee did not adopt the Administrator's position, but instead reversed the Administrator on his disposition of Vann's claim for credit for a year of service at Dixie Electric. The Committee's decision, therefore, that Vann was entitled to credit for service at Dixie Electric and that he was not entitled to make use of the repayment provision in § 12.03 reflects a uniform application of the interpretation of "retirement."

In addition to arguing that Vann has failed to present evidence of lack of uniformity in interpretation of the Plan, the Defendants have argued that the consistent practice has been to deny the ability to repay a benefit under § 12.03 to any person who had reached normal retirement age. Leota Henry Declaration, ¶ 3. Such a practice could be relevant both to the application of § 12.03 and the interpretation of "retirement" as being a person receiving full retirement benefits at normal retirement age. However, Vann argues that the Defendants' evidence only establishes that Leota Henry, the Assistant Manager of Marketing Operations in the RS & I Department, could not recall a request to repay from a participant who had reached normal retirement age. In response, the Defendants offered the Declaration of Kurt C.E. Lee, former Coordinator of Retirement Planning and Compliance, who stated that at least one request to repay by a person who had received a lump sum payment upon retirement had been made and had been denied, and this denial occurred in the early 1980's. Lee Declaration ¶ 3. Vann argues that not only can Lee not remember the name of any person to whom eligibility was denied under § 12.03, but that a denial in the early 1980's would not have been made pursuant to the Plan Specifications adopted in 1984, which are the specifications relevant to Vann's claim. However, Lee stated that he had denied requests to repay from participants who received lump sum distributions upon normal retirement pursuant to the administrative practice, which he later recommended should be incorporated in the 1984 Specifications. Lee Declaration, ¶¶ 3, 4. Therefore, there is at least some evidence that the Committee's decision was consistent with past administrative practice.

Whether or not § 12.03 has itself been applied to exclude persons similarly situated to Vann, there is "no factual basis to support a finding that the [interpretation has] resulted in arbitrary treatment of similarly situated employees." *Blank*, 926 F.2d at 1095. Absent such evidence, "the uniformity factor indicates that the ... interpretation was not arbitrary and capricious." *Cagle*, 112 F.3d at 1510.

### c. *Concern Over Future Costs*

■■■ The Defendants argue that the Committee's interpretation avoided unanticipated costs which would have affected the future financial health of the Plan and that the Committee's interpretation best protects the financial status of the Plan. The Defendants have argued that the Committee's interpretation avoids anticipated costs because if Vann were allowed to repay his distribution under § 12.03, other employees could make use of this section, subjecting the plan to unforeseen claims. The Defendants also argue that since Vann did not leave his benefits in the pension plan in order to make use of § 10.06, the plan's liability to him was extinguished, and later allowing payment of benefits based on his higher salary would have imposed a cost that was unanticipated. Vann argues that there was no danger of unanticipated costs because the Plan documents were amended so that the 1993 Plan Specifications state that they only apply to persons receiving a cash payment prior to attaining normal retirement date.

■■■ A consideration of an imposition of unanticipated costs by an interpretation of

a plan provision would be a reasonable consideration on the part of the Committee. *Griffis,* 723 F.2d at 825. However, the Defendants admit that the unanticipated costs to the program was "not expressed in the RS & I Committee's decision." Defendants' Brief in Support of Motion for Summary Judgment, page 42. Vann has argued, therefore, that this court also should not consider the factor of unanticipated costs. The Defendants have responded that Vann's position is not supported by law since the factor of unanticipated costs is explicitly referred to in the arbitrary and capricious standard applied by the Eleventh Circuit. *See e.g., Blank,* 926 F.2d at 1093. The Defendants also point out that the Fifth Circuit allows for a court to look beyond the administrative record in applying arbitrary and capricious review. *Wildbur v. ARCO Chemical Co.,* 974 F.2d 631 (5th Cir.1992). However, in the Eleventh Circuit, a district court is limited to determining whether a decision was made rationally and in good faith based on the evidence before the decision maker. *Jett,* 890 F.2d at 1139. Without an indication from the Eleventh Circuit that a plan interpretation under arbitrary and capricious review may be justified by evidence that was not considered by the plan administrator, this court finds that the factor of unanticipated costs weighs neither in favor of, nor against, a finding that the Committee acted arbitrarily and capriciously.

### d. *Internal Consistency*

■ The court notes that there likely is overlap between this factor and other factors previously discussed by the court. *See McKinnon v. Blue Cross–Blue Shield,* 691 F.Supp. 1314 (N.D.Ala.1988)(noting overlap between internal consistency factor and uniformity of interpretation). To the extent that there is a distinction to be drawn in this case, as has been discussed, the Defendants have presented evidence that the Committee's interpretation of "termination" as distinct from "retirement" is consistent with other provisions of the plan which recognize that "retirement" and "termination" are distinct concepts. *See* §§ 11, 10.01.

The Defendants have also presented other internal publications, referenced by the Committee's decision letter, to show that § 12.03 has been consistently interpreted. The Eleventh Circuit has recognized that consistency may be reflected not only in application to claims for benefits, but also in plan documents. *See Cagle,* 112 F.3d at 1518 (finding that fund's interpretation of language was consistently made as reflected in the standard subrogation agreement and the fact that no modified form of that agreement had been accepted). The Defendants point to the June 1987 R & S Program update which states that a "former participant who received a lump sum distribution, due to termination prior to Normal Retirement date, and who subsequently becomes re-employed at a participating system, may repay the amount of the distribution." Henry Declaration ¶ 6, Exhibit 1, page RS–12. The Defendants also point to a February 1993 update which states that repayment under § 12.03 was available to participants whose employment was terminated prior to normal retirement date. *Id.* ¶ 8, Exhibit 2, page RS–19. Another publication, the Options Booklet, prepared by the RS & I Department, draws a distinction between retirement and termination. Vann Affidavit, Exhibit 2, page 6. The Options Booklet states that a terminated employee has two options, one of which is to have the benefit retained in the program to become payable either in a single payment or in an annuity commencing from either the early retirement date or not later than normal retirement date. *Id.* The Defendants argue that this provision indicates that "termination" could not include a normal age retirement as there would be no reason to reference the delay in payment, since a retired employee would be able to receive full benefits upon retirement.

Vann argues that the Defendants cannot rely on the language of these administrative materials because they were given to clerical employees and were not reviewed by Vann. In offering this evidence, the Defendants do not appear to be arguing that Vann should be bound by Plan definitions in documents to which he did not have access, but instead apparently are offering these internal publications to show that a consistent interpreta-

tion has been made. Additionally, Vann admits to receiving the 1986 Options Booklet. Complaint, ¶ 10; Vann Affidavit, page 2. Therefore, the Defendants have presented evidence that the Committee's interpretation was consistent with the Plan.

Vann has also argued, however, that the Committee's interpretation was not consistent with the Summary Plan Description. Under the Summary Plan Description, "If you terminate employment, choose to receive a lump sum payment in place of deferred retirement benefits, and later return to work, you will lose some benefit credit (which would reduce your retirement benefit) unless you return the lump sum payment plus interest." Summary Plan Description, page 18. Vann argues that, at most, the Summary Plan Description's explanation of the option in § 12.03 is unclear. The Defendants dispute that the Summary Plan Description is inconsistent with the Committee's interpretation since it indicates that a "terminated" person is one who would only be entitled to deferred retirement benefits, and would not be entitled to full benefits at the time of termination. The court agrees that the Summary Plan Description does not reflect an inconsistent interpretation of § 12.03. Therefore, there is no evidence from which to conclude that the Committee's interpretation that "retirement" is not included in "termination" was inconsistent with the Plan.

In light of the evidence presented to the court as to the Committee's interpretations, the consistency factor weighs against a finding that the Committee acted arbitrarily and capriciously.

### e. *Regulations*

 The Defendants argue that had Vann's claim been allowed, the Plan would have been in jeopardy of losing its tax-exempt status under the Internal Revenue Code. According to the Defendants, Vann's interpretation would allow for discrimination in favor of highly compensated participants. The Defendants argue that since only participants who receive a lump sum distribution without an actuarial reduction and then are employed at a higher salary at another participating cooperative would benefit from Vann's interpretation of § 12.03, those par-

ticipants who would benefit from this interpretation are more likely to be highly compensated. Vann, however, disputes this conclusion, arguing that the applicability of § 12.03 would not be limited to highly compensated employees.

Whether or not the Internal Revenue Code would support the Committee's decision, however, Vann argues that there is no evidence that the tax regulations formed a basis for the Committee's decision. The Defendants state that the Committee's interpretation does not subject the plan to the risk of disqualification "regardless whether avoidance of that risk was expressed as a reason for the Committee's decision." Defendants' Brief in Support of Summary Judgment, page 41. However, there is no evidence that tax considerations were before the Committee. McKeithan recalled one reference to a tax issue, but this reference pertained to a separate question, included in the administrative materials. McKeithan Deposition, page 348. The function of this court in conducting arbitrary and capricious review is to determine whether there was a rational basis for the decision based on facts as known to the Committee. *Jett v. Blue Cross and Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989). Since there is no evidence that tax implications of Vann's claim for benefits under § 12.03 were before the Committee, this court concludes that the regulatory factor of arbitrary and capricious review does not weigh in favor of or against a finding that the Committee acted rationally and in good faith.

### f. *Factual Background Evidence of Lack of Good Faith*

 The background facts of an ERISA fiduciary's decision are looked to as evidence of the good faith, or lack of good faith, of the fiduciary in making the decision. *See Harris v. Pullman Standard, Inc.*, 809 F.2d 1495 (11th Cir.1987). Before evaluating Vann's arguments that the Committee acted in bad faith, the court will examine the parameters of bad faith which have been recognized by courts.

The former Fifth Circuit set forth some guidelines for evaluating a claim of bad faith. *See Glover v. South Central Bell Telephone Co.*, 644 F.2d 1155, 1158 (Unit A May 14,

1981).[12] In *Glover*, the court noted that the plan's procedures provided ample opportunity for the employee to present his claim. *Id.* The court held that there was no evidence tending to establish an inference that the committee acted arbitrarily, capriciously, or in bad faith because there was no indication that the plan treated similarly situated employees differently, imposed unreasonable requirements, refused to consider evidence favorable to the claim, or grossly erred in exercise of judgment. *Id.* The Seventh Circuit adopted the reasoning of the district court in which it held that a plaintiff failed to show bad faith because he failed to show that the pension appeal panel failed to consider some important aspect of his situation, offered an explanation for the decision that runs counter to the evidence, or reached a decision that was so implausible that it could not be ascribed to a difference in view. *Allison v. Dugan*, 951 F.2d 828 (7th Cir.1992).

Other relevant factors to the question of bad faith include the administrator's following of announced procedures and arriving at a decision that is supported by the facts. *See Manosh v. New England Telephone and Telegraph Co.*, 524 F.Supp. 468 (D.Vt.1981). A pension committee has been held to have acted in good faith when the committee responded to inquiries of the claimant, the claimant was given a full review hearing, the committee members considered the arguments, and denied the claim in a detailed and easily understandable letter. *Lees v. Jim Walter Corp. Pension Plan*, No. 92–1791–T–21(A), 1994 WL 370932 (M.D.Fla. Feb.17, 1994).

The Defendants have relied on evidence of the procedures which the Committee followed in reviewing Vann's claim and have argued that there is evidence of good faith because Vann was able to obtain evidence in support of his claim and was given ample opportunity to present his claim. The Defendants state that the entire administrative record during Vann's appeal to the Committee was the result of negotiations and mutual agreement and that no objection was raised to during the hearing. The Defendants also point out that Vann was represented by counsel before the Committee and presented both written and oral arguments. The Defendants also state that Vann had access to plan documents and other information and that the R & S Program provided answers to questions raised by Vann.

According to the Defendants, even though in-house counsel McKeithan drafted the letter which ultimately revealed the reasons for the denial of Vann's claim, there is nothing per se wrong with this involvement by McKeithan since courts have recognized that an administrator may adopt the statement of reasons for a benefit decision written by an in-house attorney. *Newell v. Prudential Ins. Co.*, 904 F.2d 644, 650 (11th Cir.1990) (citing *Ashenbaugh v. Crucible Inc.*, 854 F.2d 1516, 1531–32 (3rd Cir.1988)(finding no violation of ERISA for fiduciary relying on in-house counsel to help them in interpreting the plan)); *see also Short v. Central States, Southeast & Southwest*, 729 F.2d 567 (8th Cir.1984)(comparing situation of when requirement of ERISA was met when committee adopted attorney's letter and when requirements were not met when committee issued blanket statement and lawyer later wrote letter).

Vann argues in response to the Defendants' Motion for Summary Judgment that genuine issues of material fact have been presented as to whether the Committee's decision was reached in good faith and with proper motives. *See Hoover v. Blue Cross and Blue Shield of Alabama*, 855 F.2d 1538, 1542 (11th Cir.1988) (issue of good faith is a fact question). Vann does not appear to dispute that the procedures that were put in place when his claim was decided were adequate. Vann has, however, presented evidence by which he has sought to call into question whether the Committee actually fol-

---

12. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Although *Glover* was decided before the Supreme Court's decision in *Bruch* mandated that de novo review was to be applied in absence of a grant of discretionary authority, this case describes bad faith which is still an applicable factor under arbitrary and capricious review.

**1048**

lowed its announced procedures and fully considered his claim. Vann's theory rests on separate areas of evidence: that the Committee did not consider the information available to it and that the Committee was improperly influenced by McKeithan.

Vann has argued that there is no evidence that the Committee considered a box of materials which was available for their review when it met after the hearing on Vann's claim since Terrill, a Committee member, testified that, to his knowledge, no Committee member looked in the box of materials. Terrill Deposition, page 23, lines 21–23. Vann has also argued that the decision letter was drafted by McKeithan with little direction from the Committee.

The Defendants respond that it is undisputed that Committee members were given three-ring binders which contained the Administrative Record. According to the Defendants, this evidence refutes Vann's argument that the Committee did not consider all the relevant material simply because a box of information was not reviewed. The Defendants also point out that the materials in the binders were reviewed by Vann's representatives who were allowed to comment on them and to propose changes or additions. McKeithan Deposition, pages 270–272. In addition, the Defendants have provided evidence that McKeithan attached materials including the drafting history of § 12.03 to the draft decision letter provided to the Committee members. McKeithan Deposition, Exhibit 53. McKeithan stated in his deposition that before drafting the decision letter, a committee member spoke with him and mentioned that a letter contained in the Administrative Record indicated Vann's knowledge of portability, and that the Committee member flipped through the three-ring notebook and pointed to documents within the record stating, "This is sort of the way the committee felt about it." *Id.* page 308. Consequently, Vann has failed to establish his burden of providing evidence to indicate that there is an issue of fact as to whether the Committee considered the arguments and evidence relevant to his claim.

Vann has also argued that the Committee acted in bad faith because it was improperly influenced by McKeithan and because the Committee did nothing more than 'rubber stamp' the decision that McKeithan had already prepared. The court notes, however, that there is no evidence to substantiate any allegation that McKeithan had already drafted the Committee's decision letter before the Committee rendered an oral decision on Vann's claims. Vann contends that there is evidence that McKeithan may have improperly influenced the Committee. He points to the fact that in response to a question about whether Vann's claim would create a "loophole" from two Committee members prior to the meeting on Vann's claim, McKeithan told the two Committee members that Vann's claim could allow people to repay and get an advanced benefit. McKeithan Deposition, page 294. Vann also points to the fact that McKeithan drafted the Committee's decision letter and the Committee approved this letter without making any changes.

The Defendants argue that Vann's assertion is meritless because there is no evidence that McKeithan had any reason to seek the denial of this claim. Vann has argued that McKeithan sought to uphold his prior determinations, for which he wrote letters over Williams' signature, with regard to Vann's claims. However, the court has been presented no evidence to support this argument. Even if McKeithan were motivated to try to influence the Committee to uphold the previous decisions, it is undisputed that the Committee reversed one of McKeithan's prior determinations; therefore, there is no evidence that the Committee was influenced by this purported motive on the part of McKeithan. Furthermore, Vann has not presented any evidence to indicate that the Committee, to the extent that it knew McKeithan's opinion of the preferable outcome on Vann's claim, deferred to McKeithan's opinion. That is, although Vann has presented evidence which he contends shows that McKeithan improperly tried to exert influence by his comments in response to queries about a "loophole" that Vann's claim might create, Vann has provided no evidence to show that the Committee was so influenced. The Defendants, however, have presented the deposition testimony of Terrill,

one of the Committee members who participated in the conversation with McKeithan, in which he stated that the conversation with McKeithan did not influence his decision with respect to Vann's appeal. Terrill Deposition, page 87, lines 17–23.

The court finds that Vann has not provided sufficient evidence from which to conclude that the background facts of Vann's appeal of his claim for benefits allow for an inference of a lack of good faith to be drawn. There is evidence that adequate procedures were afforded, that a fair hearing was held, and the Committee considered materials relevant to Vann's claim, although it may not have considered all materials available to it. Therefore, the court concludes that this factor does not weigh in favor of a finding that the Committee acted arbitrarily and capriciously.

Taken together, the court finds that the applicable factors relevant to arbitrary and capricious review reveal that Vann has failed to establish that the Committee did not act rationally and in good faith. Instead, the evidence reveals that the Committee made reasonable interpretations of the plan, that the Committee's interpretations were not inconsistent in application, nor with the plan as a whole, and that the background facts of Vann's appeal do not indicate a lack of good faith. Accordingly, the Defendants are entitled to summary judgment as to Count I.

The Defendants have argued that a determination of Vann's claim in Count I is also dispositive of his claim under paragraphs 44(a) and 45 of Count II, the portion of Count II which asserts a claim for breach of fiduciary duty based upon the Defendants' failure to inform him of the five-year repayment limitation under § 12.03. It does not appear to the court that Vann has contested this interpretation of his claims. The court agrees that because Vann was not a person to whom § 12.03 applied, the Defendants are entitled to judgment on a claim for breach of fiduciary duty based upon the Defendants' failure to inform Vann of this provision. Therefore, the court finds that the Defendants' Motion for Summary Judgment as to Count I and paragraphs 44(a) and 45 in Count II is due to be granted, and that the

Plaintiff's motion for summary judgment as to Count I is due to be denied.

## SUMMARY JUDGMENT MOTION AS TO COUNT II

 Count II of Vann's complaint concerns his claims that the Administrator breached fiduciary duties to Vann, including a duty to advise him of § 12.03, which is subsumed in the resolution of the issues in Count I, and a duty to give Vann complete information with regard to his transfer option under § 10.06.

The Defendants have moved for summary judgment arguing that Vann's claims for breach of fiduciary duty based on information relating to § 10.06 are time barred, and that his claims for relief fail to state a claim under ERISA because Vann has stated a claim for damages, not equitable relief.

The statute of limitations for ERISA claims is found in 29 U.S.C. § 1113. Under this provision, no action may be commenced "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113 (Supp.1997).

Application of 29 U.S.C. § 1113 requires identification and definition of the underlying ERISA violation upon which the fiduciary breach claim is founded. *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1178 (3rd Cir.1992). Vann has explained that his claim based on breach of fiduciary duty is that he was not provided with all complete and correct information about the transfer provision in § 10.06 upon which to base his 1988 benefits election. The Defendant has not disputed this characterization of the claim by Vann, but has analyzed Vann's claim as an allegation of an omission.

The relevant question, therefore, is the latest date at which the fiduciary, Administrator Williams, could have cured the alleged violation. According to Vann, the breach of fiduciary duty can be cured by order of this court to the Administrator to administer the Plan to allow Vann to have his retirement benefit calculated as if he had transferred his

benefit under § 10.06. The Defendants, however, state that the Administrator's ability to cure is circumscribed by the terms of the plan, not by what a court may ·order the Administrator to do.

The Defendants cite *In re Unisys Corporation Retiree Medical Benefits ERISA Litigation,* 957 F.Supp. 628 (E.D.Pa.1997), to support the idea that the last date on which the Administrator could have cured the alleged breach or violation was the day that Vann left employment with Dixie Electric or the day he took the lump sum distribution. In that case, the court reasoned that the last date upon which the fiduciary could have cured the failure to correct employees' understanding of the guarantee of irrevocability of benefits was the date upon which the employees retired with this belief. . *Id.* at 638. Vann points out that the statement in the Pennsylvania district court's opinion regarding the last date on which an omission could have been cured was dicta. *Id.* The court held that the last act constituted the breach of fiduciary duty occurred on the date that the employees retired because that was the last date on which a misrepresentation could have affected a decision to retire. *Id.* However, the reasoning of this court with regard to the "omission" provision of the statute of limitations supports the idea that the last date that a fiduciary breach could have been cured is the last date that the fiduciary could have corrected a mistaken belief before that belief was relied upon. By analogy, in this case, the last date on which the Administrator could have cured the omission would have been the last date before Vann made the decision to receive his lump sum distribution.

The Defendants also cite *Reich v. Johnson,* 891 F.Supp. 208 (D.N.J.1995), a case concerning application of the fiduciary breach statute of limitations in the case of an omission. In *Reich,* the fiduciary purchased stock, but in doing so, failed to diversify the investment. The court characterized this breach as breach by omission. Although the initial failure to diversify occurred in 1988, the court held that the fiduciary could have cured this breach until 1991, the last point at which the stock had value, because the fiduciaries could have sold the nondiverse stock. *Id.* at 209.

Applied to this case, the Administrator allegedly failed to give full information, but he could have cured that failure as long as Vann could have learned the correct information and could have chosen to make a different decision. Therefore, it appears that the question is the latest date at which the Administrator could have more fully informed Vann and Vann could have made a different decision.

According to the Defendants, the latest date at which the Administrator could have cured the alleged breach of fiduciary duty, within the requirements of the Plan, was in January of 1988 when Vann's benefits election became irrevocable. The Defendants have argued that the terms of the R & S Program did not provide a mechanism whereby the Administrator could allow Vann to revoke his election of the lump sum benefit. As support for the argument that Vann's election of benefits was irrevocable, the Defendants cite to § 8.03 which concerns the form of a retirement benefit. Under this provision, a "participant may, at any time before the commencement of benefits, make any number of revocations of elections with the consent of the spouse and, if no other election is made, benefits shall then be paid in the form of a Joint and Spouse Annuity." § 8.03. This provision, therefore, dictates that the form in which a participant elects to receive a retirement benefit is irrevocable. Although this provision makes the election of form of payment irrevocable, if the initial election itself were also not irrevocable, a person could circumvent the irrevocability provision by electing to take a distribution, waiting for payment of benefits to commence, elect to transfer, then again elect to receive the distribution, but in a different form. In other words, reading the irrevocability provision narrowly is not consistent with the apparent purpose of the provision.

There is also additional evidence that an election to take a distribution is irrevocable. Under § 10.06, a participant has up to six months to be employed by a participating member cooperative and transfer the retirement benefit. However, a participant is not allowed to make use of § 10.06 if he or she has exercised any of the rights which accrue

upon termination of employment. § 10.06(d). Apparently, therefore, once Vann elected to exercise his right to take a lump sum distribution of his retirement benefit, that election was irrevocable and he was no longer eligible for the transfer provision.

Vann argues that § 8.03 does not preclude change of election at a later time, if needed, to achieve equity for a plan participant or beneficiary. The Defendants respond that the provisions of the Plan do not allow for the Administrator to depart from its provisions to "achieve equity." The Defendants argue that even a court should not order the Administrator to violate the provisions of the Plan. Vann has argued, however, that the Plan often departed from specified time limits in cases where participants had not been fully informed. Vann cites to examples of persons who circumvented the five-year limitation period under § 12.03 when it was determined that they did not know about § 12.03. Apparently, therefore, Vann is arguing that the Plan would not have been able to enforce any irrevocability provision, given its past practice of allowing people to circumvent time limitations. However, there is no evidence to suggest that any limitations have been waived outside of the five-year limitation in § 12.03; specifically, there is no evidence to support the conclusion that the irrevocability period in § 8.03 has ever been waived.

Under Vann's proposed interpretation, the latest date upon which the Administrator could have cured the alleged breach could be at the time of this court's order, since a court could award the relief he seeks, enjoining the Administrator to administer the plan so as to remedy the breach, even today. As the Defendants point out, under this logic, there would be no statute of limitations because as long as a court can order equitable relief, the ability to cure still exists.

Vann also argues that the latest date upon which the Administrator could have cured the alleged breach of fiduciary duty was on February 25, 1995, when the Committee decided Vann's appeal, because, at that time, they could have ruled in Vann's favor as to the failure of the R & S Program Representatives to properly inform him of his options under § 10.06. The Defendants' response to this argument is that even if Vann could change his election of the lump sum payment after he was paid the lump sum distribution, the only way to make use of the transfer provision would be to repay his lump sum distribution and then have the full amount transferred under § 10.06. The Defendants state, therefore, that since the Administrator cannot allow Vann to repay his lump sum distribution under § 12.03, once Vann was paid his lump sum distribution, his election was irrevocable, and the Administrator could no longer cure the alleged breach of fiduciary duty. According to the Defendants, if the Administrator could have cured after January of 1988, this would mean that the Administrator would be able to violate the terms of the Plan.

It appears to the court that a distinction should be drawn between a "cure" of a breach of fiduciary duty and a claim for equitable relief based upon that breach of fiduciary duty. Vann has argued that the alleged breach of fiduciary duty in this case could be cured by this court, or in the alternative, could have been cured by the Committee. However, what Vann appears to be arguing is that this court should find that the breach of fiduciary duty could have been cured because equitable relief for breach of fiduciary duty could have been granted. The relevant issue is not whether the Committee or the court could provide Vann with a remedy, but the latest date upon which the Administrator could have cured the breach of fiduciary duty. Had Vann filed a claim within six years of the date upon which his election became irrevocable, then he could have sought some form of equitable relief for breach of fiduciary duty, regardless of whether the Administrator would have had the authority to allow him to repay his lump sum distribution. However, because he failed to file a claim within six years of that date, his claim is barred by the statute of limitations.[13]

13. Vann has also argued that the Defendants should not be allowed to rely on the statute of limitations. Vann argues that the Committee conducted administrative proceedings and never

Vann has argued that this court should not rely on the statute of limitations because it would be unfair to determine that Vann's claim was barred before he was aware of the alleged fiduciary breach. However, the statute of limitations does not allow for a tolling of the period based on considerations of when the claimant became aware of the alleged breach, unless there is an allegation that the fiduciary breach resulted from fraud or concealment. *See* 29 U.S.C. § 1113. Courts interpreting this provision have held that the "discovery rule," provided for in the statute of limitations, only applies to allegations of fraud. *See Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C.Cir.1994). In this case, Vann has based his claim on an omission, rather than an allegation of fraud or concealment, therefore, there is no mechanism by which to toll the running of the six-year statute of limitations. The court finds, based on Vann's characterization of his claim as an omission, and based upon the statutory language which does not provide for tolling of the statute of limitations unless there is fraud or concealment, that the statute of limitations operates to bar Vann's claim. The Defendants are entitled to summary judgment as to Count II of Vann's Complaint.[14]

## V. *CONCLUSION*

For the reasons discussed, the court concludes that the Defendants' Motion for Summary Judgment as to Count I and paragraphs 44(a) and 45 is due to be GRANTED,

the Defendants'. Motion for Summary Judgment as to the remainder of Count II is due to be GRANTED, and that the Plaintiff's Motion for Summary Judgment as to Count I is due to be DENIED. A separate Order will be entered in accordance with this Memorandum Opinion.

---

mentioned that the fiduciary claim was time-barred, but instead informed Vann that he had one year from the date of the Committee's decision to file a complaint in court. The Defendants state that the Committee was required to address Vann's claims and that the one-year period of time of which the Committee advised Vann was a contractual period of limitations under which he was required to bring suit, but that the Committee made no statement as to the statute of limitations under the law. Furthermore, to the extent that Vann points to the actions of the Committee and the one-year limitation in support of an estoppel-type argument, this argument is unavailing since the ERISA statute of limitations would have lapsed before the Committee's decision, so that any actions by the Committee could not have been relied upon by Vann to his detriment.

**14.** To clarify, Count II concerns a claim for breach of fiduciary duty based on two separate

sections of the Plan. The court has already held that the Defendants are entitled to judgment as to that portion of Count II which relates to Section 12.03 because, since Vann was not entitled to make use of Section 12.03, it appears to be uncontested that no fiduciary duty was breached by failing to inform Vann of a provision which did not apply to him. Therefore, because that portion of Count II which relates to Section 10.06 is barred by the statute of limitations, the Defendants are entitled to judgment as to Count II in its entirety. In addition, the court notes that Vann has also brought a Count III against the Defendants which is a claim for attorney's fees. However, since Vann is not entitled to judgment as to Counts I or II, the court finds that the claim in Count III is moot; therefore, Count III of the Complaint is DISMISSED.